# DECLARATION OF ANN MARIE SULLIVAN

## EXHIBIT LIST

**EXHIBIT 1**     U.S. Customs and Border Protection ("CBP"), *Intellectual Property Rights: Fiscal Year 2018 Seizure Statistics Report* (2018). Available at: cbp.gov/trade/priority-issues/ipr/statistics.

**EXHIBIT 2**     Mark Monitor. *Traffic Report: Online Piracy and Counterfeiting* (January 2011).

**EXHIBIT 3**     Business Action to Stop Counterfeiting and Piracy (BASCAP) & the International Trademark Association (INTA), *The Economic Impacts of Counterfeiting and Piracy* (2016).

**EXHIBIT 4**     The Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (Hague Service Convention) (Nov. 15, 1965), 20 U.S.T. 361, 658 U.N.T.S. 163.

# EXHIBIT 1



# Intellectual Property Rights

## Fiscal Year 2018 Seizure Statistics

*Prepared by*

U.S. Customs and Border Protection
Office of Trade



Homeland
Security



Executive Summary..................................................6

Year in Review......................................................7

IPR & E-Commerce ...............................................15

Fiscal Year 2018 IPR Seizure Statistics ......................16

Number of Seizures by Product .................................20

Products Seized by MSRP .......................................22

Total MSRP for Products Seized by Economy .............24

Seizures by Economy.............................................26

Seizures by Shipping Environment.............................28

Health, Safety, and Security .....................................30

Exclusion Orders ..................................................32

Centers of Excellence and Expertise...........................33

IPR Points of Contact .............................................34

Disclaimer: The information contained in this report does not constitute the official trade statistics of the United States. The statistics, and the projections based upon those statistics, are not intended to be used for economic analysis, and are provided for the purpose of establishing U.S. Department of Homeland Security workload.

# EXECUTIVE SUMMARY

Products that infringe U.S. trademarks and copyrights are subject to exclusion orders issued by the United States International Trade Commission threaten the health and safety of American consumers and pose risks to our national interests. U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement (ICE) Homeland Security Investigations' (HSI) enforcement of intellectual property rights (IPR) mitigates the financial and welfare risks posed by imports of illicit products.

Each year, more than 11 million maritime containers arrive at our seaports. At our land borders, another 10 million arrive by truck and 3 million arrive by rail. An additional quarter billion more cargo, postal, and express consignment packages arrive through air travel. The Department of Homeland Security (DHS) remains vigilant in targeting shipments containing IPR-infringing goods, levying civil fines and criminally investigating those who seek to violate our trade laws, harm consumers, and damage our economy.

In fiscal year (FY) 2018, the number of IPR seizures decreased by 333 seizures to 33,810 from 34,143 in FY 2017. The total estimated manufacturer's suggested retail price (MSRP) of the seized goods, had they been genuine, increased to nearly $1.4 billion from over $1.2 billion in FY 2017.

In FY 2018, ICE-HSI arrested 381 individuals, obtained 296 indictments, and received 260 convictions related to intellectual property crimes.

# IPR & E-Commerce

E-commerce sales, including those through third-party platforms, have resulted in a sharp increase in the shipment of small packages into the United States. In FY 2018, there were 161 million express shipments, and 475 million packages shipped through the international mail environment.

Over 90% of all intellectual property seizures occur in the international mail and express environments. A majority of those fall under the de minimis threshold of $800.

In March 2018, CBP released its CBP E-Commerce Strategy. The strategy strengthens CBP's ability to protect the public and U.S. economy from noncompliant goods. The strategy drives compliance and enforcement, and promotes coordination. CBP is working toward implementation.

More e-commerce related information can be found at
https://www.cbp.gov/trade/basic-import-export/e-commerce



**Growth of Small Shipment (in millions)**

## FISCAL YEAR 2018 IPR SEIZURE STATISTICS
## BY NUMBER OF SEIZURES



46 %

41 %

2 %

1 %

1 %

9 %

China (Mainland)

Hong Kong

Turkey

India

Taiwan

All Other Countries

## FY 2018 TOTALS:
33,810 - NUMBER OF SEIZURES
$1,399,873,842 - MSRP

# EXHIBIT 2

January 2011

# Traffic Report: Online Piracy and Counterfeiting



# Traffic Report: Online Piracy and Counterfeiting

## Contents

Key Findings ............................................................. 4

Methodology ........................................................... 4

Criteria for Websites .................................................. 5

Traffic Analysis........................................................ 7

Conclusion ............................................................. 8

The Internet is arguably one of the greatest innovations of modern society—allowing for countless new businesses to thrive and dramatically altering the way society operates. The Internet has enabled a global marketplace to flourish with lightning-quick communication and an unparalleled access to information. However, the advancement of the Internet into nearly all of our daily activities, combined with rapid download speeds, the perfection of digital copies, the rise of e-commerce and the complexity of online enforcement, has magnified the seriousness and consequences of online counterfeiting and piracy. Websites offering pirated goods generate billions of visits annually, and websites that sell counterfeit luxury goods, fake drugs, and products that may pose health and safety risks attract hundreds of millions annually.

Recognizing that illicit online sales have a significant impact on the U.S. economy in financial terms as well as in public health and well-being, MarkMonitor® worked to identify a sample of rogue Internet sites that are responsible for trafficking counterfeit and pirated goods. The goal of the project was to illustrate the nature of this illicit ecosystem and, using publicly-available traffic information on the number of visits, determine its scope.

The first step was to identify business categories and brands targeted by online counterfeiters and digital pirates. Using 22 major brands as criteria—ranging from pharmaceuticals, luxury goods, and apparel to entertainment titles and software—MarkMonitor used its patented technology to comb the Internet for sites suspected of offering counterfeit goods or pirated digital content. The initial scans resulted in more than 10,000 results which were then de-duplicated and filtered further using MarkMonitor technology to identify dedicated e-commerce and digital download sites. The final step required hand-examination and verification of more than 600 results to determine classification. Since some sites offered multiple brands, this step led to almost 100 unique domains or websites which were then classified in one of two ways: 'counterfeit' or 'digital piracy'.

 Using publicly-available Internet traffic data from Alexa, the sites were then ranked by the number of visits, which were significant, speaking to the level of demand for these goods as well as to the website operators' success in promoting these sites so they are visible and accessible online. Since the study used a sample of only 22 brands, it provides a small glimpse of the nature of online intellectual property (IP) theft and the dark side of illicit e-commerce. However, given the large number of popular brands, it is reasonable to assume that hundreds of thousands of other rights-holders, brands and content creators are suffering the same damage.

> *As our economy has worsened, brand abusers have sharpened their focus.*

## Key Findings

The study's findings demonstrate that online distribution of pirated digital content and e-commerce sales of counterfeit goods is rampant. Specific findings include:

- In total, the 10 media brands in the study yielded 43 unique sites classified as 'digital piracy.' Traffic generated to these sites was over 146 million visits per day, representing more than 53 billion visits per year.

- The top-three websites classified as 'digital piracy'—rapidshare.com, megavideo.com, and megaupload.com—collectively generate more than 21 billion visits per year.

- The availability of reliable infrastructure is an important factor in the location of sites hosting piracy. The study found that North America and Western Europe represented the host location for 67 percent of the sites classified as 'digital piracy.'

- The combined traffic to the 48 sites selling counterfeit goods is more than 240,000 visits per day on average or more than 87 million visits per year.

- When it comes to host location of the sites categorized as 'counterfeit', 73 percent were hosted in North America or Western Europe. Eastern European countries hosted another 14 percent of the sites while 9 percent of the sites were hosted in Asia.

- The combined traffic to the 26 sites selling counterfeit prescription drugs is more than 141,000 visits per day on average or more than 51 million visits per year.

- The combined traffic to the 21 e-commerce sites selling counterfeit luxury goods is more than 98,000 visits per day on average or almost 36 million visits per year.

These findings are just the tip of the iceberg. The true scope of the problem is exponentially higher in terms of user traffic, lost revenue and risks to public health and safety.

## Methodology

Using a list of industries most affected by online counterfeiting and digital piracy,[1] MarkMonitor chose major brands from each industry and ran automated scans for those brands using its patented technology. In all, the study examined 22 brands in the digital content category (movies/TV shows, music and software/videogames) and the physical goods category (handbags, sports apparel, pharmaceuticals and luxury items, footwear, and apparel.)

The study used very narrow criteria to classify sites selling physical goods as 'counterfeit.' It is important to point out that many of the e-commerce sites that did not meet that strict guideline did display multiple factors arousing suspicion. This

> *The study used only 22 brands, so we can assume that many other brands and content-creators are suffering similar damage.*

---

[1] Digital Content industries: Entertainment (music/movies/television shows), Software/Videogames; Physical Goods: Handbags, Sports Apparel with logos, Pharmaceuticals, luxury items, footwear, and apparel.

underscores the crucial role that brand owners and law enforcement personnel trained by brand owners play in determining whether a site is offering counterfeit goods. Technology can be used to conduct the heavy lifting in identifying and prioritizing sites for further action, but the in-depth market and product knowledge of brand owners' is vital.



Site attracts more than 10 million visits per day.

The scans focused on identifying e-commerce and peer-to-peer, streaming, and torrent sites that yielded high traffic levels. In order to be classified as an e-commerce site, the site needed to contain a shopping cart while the sites classified as piracy needed to contain some type of link, index or player that could be used to download, stream or share digital content. These criteria were designed to eliminate editorial, blog or discussion sites and to focus exclusively on sites where pirated goods could be shared, viewed, streamed or downloaded and counterfeit goods could be purchased.

The initial scans resulted in more than 10,000 results which were then de-duplicated and filtered further using MarkMonitor technology to identify dedicated e-commerce and digital content sites used for downloading, sharing or streaming. The final step required hand-examination and verification of more than 600 results to determine classification. Since some sites offered multiple brands, this step led to almost 100 unique domains or websites which were then classified as either 'counterfeit' or 'digital piracy'. The results were ranked by the amount of traffic, defined as the number of daily visits, using Alexa-supplied information. None of the scans contained MarkMonitor customer data or information.

## Criteria for Websites

The results from the initial scans were examined further by MarkMonitor experts in order to classify these sites, or domains, into one of two categories: 'counterfeit' or 'digital piracy.' After thorough analysis, MarkMonitor concluded that 91 websites with high traffic numbers qualified for inclusion in one of these categories. The 'counterfeit' classification referred to e-commerce sites selling counterfeit physical goods while the 'digital piracy' classification refers to sites offering pirated versions of music, movies, television shows, software, and videogames.

**Digital Piracy:** The total number of unique domains identified as 'digital piracy' totaled 43. To fit the 'digital piracy' classification, the domain needed to offer or point to one or more of the brands used in the digital content portion of the study for free. While some of these sites do offer takedown processes for pirated

content, the action must be initiated by the content owner. The resulting domains were then sorted by traffic volume.

**'Counterfeit':** In the case of e-commerce domains selling physical goods, the domains needed to satisfy one of two conditions to be deemed as selling counterfeit goods: (1) either the domain itself specified that the goods were not authentic (i.e., using terms like "replica," 'knock-off,' and 'copy') or (2) in the case of pharmaceuticals, the domain offered 'generic' versions of prescription drugs that are not available in generic form in the U.S., targeted the U.S. market by providing pricing in U.S. currency, and did not require a prescription.[2] Since some domains offered more than one type of product, the domain is counted only once, even if multiple URLs for that domain surfaced during the scans. MarkMonitor found that 48 websites fell under the criteria for selling counterfeit goods.

While the online pharmacies displayed the 'generic' label prominently on product listings, MarkMonitor needed to consult FAQ or 'About' sections of the online drugstores, or even needed to follow the purchase process, in order to determine if prescriptions were required by the online pharmacy. In addition, MarkMonitor examined the currency used to quote prices, shipping information or other information on the site that indicated markets served, such as flags, shipping information, telephone numbers or references to the U.S. Drug Enforcement Agency. Many of the e-commerce domains selling counterfeit goods displayed the term 'replica' quite prominently while others included such information in their FAQ or 'About.'



Site sells 'generics' without prescription for prescription drugs that are not available in generic form.



Site explains the difference between 'generic' and branded prescription drugs and highlights unmarked shipping envelopes.

---

[2]  During the course of the study, MarkMonitor identified some additional sites that fit the criteria for inclusion but did not use one of the original media brands such as sites offering key generators used to 'unlock' protected material.

## Traffic Analysis

As a backdrop to examining website traffic figures, it is important to point out that traffic measurements can vary greatly depending on methodology. Some traffic measurement sources depend on technology, others depend on some type of user panel or community, and a third category uses a hybrid approach. Each approach has advantages and disadvantages which, as a result, allow publicly-available traffic data to vary based upon the measurement source. In this study, MarkMonitor used data based on Alexa. The more than 90 unique domains culled from the initial set of over 10,000 results display a wide range of traffic figures, depending on the type of goods being offered.

**Digital Piracy Web Traffic Analysis:** Those domains classified as 'digital piracy' attracted the highest levels of traffic with a high in excess of 32 million daily visits on average for the most-trafficked domain—rapidshare.com. On an annual basis, that traffic equates to more than 11.8 billion visits per year for that site. This pattern continues with the second and third most-trafficked sites—megavideo.com and megaupload.com—each of which generates more than 13 million visits per day on average, or more than 4.9 billion visits per year to each site. Collectively, these three digital piracy sites generate more than 21 billion visits per year.

In total, traffic generated to the sites classified as 'digital piracy' was more than 146 million visits per day, representing more than 53 billion visits per year. Lest these figures be viewed as anomalies, examining the ten least-visited 'digital piracy' sites show annual visits total more than 781 million per year, demonstrating that even the lesser-trafficked sites in this category drive significant traffic.

The bulk of the 'digital piracy' sites, or 67 percent, were hosted in North America or Western Europe.

**Counterfeit Website Traffic Analysis:** Due to the narrow criteria used to classify sites as 'counterfeit,' all the sites included in the analysis, with one exception, sold prescription drugs or luxury goods, including handbags, watches or jewelry. The combined traffic to the 48 sites selling counterfeit goods is more than 240,000 visits per day on average or more than 87 million visits per year. The majority of these sites reflect similar patterns as the sites classified as 'digital piracy' when it comes to the server's host location with or 56 percent hosted in North America and Western Europe. However, Eastern European countries hosted 22 percent of the sites while 14 percent of the sites were hosted in Asia.

> *Traffic to sites suspected of offering pirated content was over 146 million visits per day.*



Site attracts more than seven million visits per day.

However, examining the site registration information for these 'counterfeit' sites suggests that more of these sites may be linked to Asia as seven sites hosted in non-Asian countries are actually registered by Asian registrars. Factoring in that information indicates that 29 percent of the sites have some connection to Asia, either through host location or registrar.

While not at the scale of the suspected digital piracy sites, e-commerce domains classified as 'counterfeit' attracted considerable levels of traffic as well with the most-trafficked site, an Internet pharmacy, driving 28,000 daily visits on average, representing more than 10 million visits to the site per year.

**Suspicious Sites:** During the course of the research, we identified sites that displayed one or more factors that appeared questionable, such as significant price discounts, links to sites selling counterfeit goods, trade dress issues, or, in the case of online pharmacies, no requirement for prescriptions. These types of issues underscore the crucial role that brand owners and law enforcement personnel trained by brand owners play in determining whether a site is offering counterfeit or pirated goods. While some sites are very clear in specifying their goods are 'copies' or 'replicas,' others are less forthcoming. In many cases, deep discounts combined with promises of high-quality goods from the current season raise questions that only the brand owner— with knowledge of channel strategy, pricing and partnerships—can address.

In the case of highly regulated goods like pharmaceuticals, intellectual property protections for pharmaceutical patents or regulations governing generics may differ across national boundaries. Instead, the business practices of the pharmacy itself— such as prescription requirements or sales of individual pills—are more useful in identifying suspicious drugs. The role of the brand owner, with in-depth knowledge of distribution channels, pricing and local business practices, is vital. In each of these examples, the most authoritative answer is provided by a physical examination of the goods themselves.

> *Combined traffic to the sites selling counterfeit goods is more than 87 million visits per year.*



This site promotes replica designer bags and attracts more than two million visits annually.

## Conclusion

The research presented in this study demonstrates the wide availability of pirated digital content and counterfeit goods via the Internet and e-commerce. The websites yielded in the research and analyses of this study all have one thing in common: business models that are indisputably centered on the sale or distribution of counterfeit and pirated goods. These illegal operations are shifting revenue

from legitimate brands' e-commerce sites, causing economic harm and risking consumer health. This study highlights the type of data that needs to be examined in order to identify and locate sites trafficking in counterfeit and pirated goods. Accurate and unbiased information describing the scope of online counterfeiting and piracy as an essential prerequisite for safeguarding consumer safety and economic well-being.

While counterfeiting and piracy in the physical world are serious problems, these issues are growing at a significant rate online and pose unique challenges in remediation, due to the inherent nature of the Internet with its global reach, cost efficiencies, and anonymity. Awareness and educational efforts focused on the distinctive nature of online counterfeiting and piracy are necessary in developing effective response mechanisms to this global, cross-border problem. Necessary government policies, corrective legislative measures, law enforcement action and, most importantly, actively-engaged brand owners are all needed to stem this growing tide of illegal Internet activity. The bottom line is that online IP theft ultimately affects the most creative and innovative sectors of the economy, contributing to billions in lost revenue and millions of lost jobs. Protecting IP rights is a critical component of our economic resurgence, and vitally important to our future; stopping the spread of pirated and counterfeit goods is a necessity.

> *Combined traffic to the pharmacies selling suspected counterfeit prescription drugs is more than 51 million visits per year.*

9

## About MarkMonitor

MarkMonitor, the global leader in enterprise brand protection, offers comprehensive solutions and services that safeguard brands, reputation and revenue from online risks. With end-to-end solutions that address the growing threats of online fraud, brand abuse and unauthorized channels, MarkMonitor enables a secure Internet for businesses and their customers. The company's exclusive access to data combined with its patented real-time prevention, detection and response capabilities provide wide-ranging protection to the ever-changing online risks faced by brands today. For more information, visit **www.markmonitor.com**

More than half the Fortune 100 trust MarkMonitor to protect their brands online. **See what we can do for you.**

MarkMonitor, Inc.
U.S.        (800) 745.9229
Europe    +44 (0) 207.840.1300
**www.markmonitor.com**

Boise  |  San Francisco  |  Washington D.C.  |  London



© 2011 MarkMonitor Inc. All rights reserved. MarkMonitor® is a registered trademark of MarkMonitor Inc. All other trademarks included herein are the property of their respective owners. Source Code: TROCPWP101208

# EXHIBIT 3



# THE ECONOMIC IMPACTS OF COUNTERFEITING AND PIRACY

Report prepared for BASCAP and INTA



# CONTENTS

Foreword

Executive Summary                                                                           6
   1.1   Extending the findings of the OECD/EUIPO                           6
   1.2   Key findings                                                      7
   1.3   Analytical approach                                               9
   1.4   Agenda for future research                                        9

2     Introduction                                                          11
   2.1   Background and context                                            11
   2.2   Extending the findings of the OECD/EUIPO: estimating the global incidence
        of counterfeiting and piracy and its effects                  12

3     Quadrants 1 and 2: The global value of counterfeiting and piracy      14
   3.1   Quadrant 1: The OECD/EUIPO's estimates of international trade in
        counterfeit and pirated goods                                 14
   3.2   Quadrant 2: estimating the domestic production and consumption of
        counterfeit and pirated goods                                 16
   3.3   Conclusion and discussion                                         22

4     Quadrant 3: The global value of digitally pirated goods in specific
     sectors                                                               23
   4.1   Introduction                                                      23
   4.2   Film                                                              23
   4.3   Music                                                             28
   4.4   Software                                                          34
   4.5   Conclusion and discussion                                         37

5     Quadrant 4: Wider economic costs                                      40
   5.1   Introduction                                                      40
   5.2   Econometric analysis of impacts on economic growth                41
   5.3   Impacts on displaced economic activity, tax, employment and investment   46
   5.4   Other social impacts                                              50
   5.5   Conclusion                                                        53

6     Conclusions                                                           54
   6.1   Projections of the future incidence of counterfeiting and piracy   54
   6.2   Projection of wider social and economic costs                     56
   6.3   Summary of results                                                56

**Annex A**    Constructing an average price of movies ........................................59

**Annex B**    Constructing an average price of music...........................................60

## Foreword

When BASCAP commissioned Frontier Economics to do a report in 2011 on the global impact of counterfeiting and piracy, our aim was firstly to build on the seminal work of the OECD to—for the first time ever—undertake a data-based, econometric approach to quantifying the value of counterfeiting and piracy; secondly, we set out to pick up where the OECD left off, by expanding their work to include several categories of counterfeiting and piracy that they did not address. Our findings were somewhat alarming, in terms of the magnitudes, but also the projections of how the problem of counterfeiting and piracy would continue to grow in the years to follow. At that time, Frontier estimated that the total global economic value of counterfeit and pirated goods was as much as $650 Billion per year, and projected that this figure would grow to almost $1.8 Trillion by 2015.

As 2015 drew to a close, BASCAP, together with the International Trademark Association (INTA), asked Frontier, to update their report. They have found that counterfeiting and piracy continue to grow at an astounding rate. And, despite increased efforts by the private sector, governments, international government organizations and a growing number of NGOs, the problem is getting worse, not better.

This troubling trend was confirmed last year when OECD/EU IPO issued a report updating their original 2008 report on the level of international trade in counterfeit goods, where they found an 80% increase in counterfeiting between 2008 and 2013.

In developing this report, Frontier has once again collaborated with OECD on methodologies and once again addressed additional impacts of counterfeiting a piracy beyond losses associated with cross border trade in fakes. Additionally, the new Frontier study takes a deeper look into the broader social economic impacts of counterfeiting and piracy.

This report shows that the infiltration of counterfeit and pirated products, or *IP theft,* creates an enormous drain on the global economy – crowding out Billions in legitimate economic activity and facilitating an "underground economy" that deprives governments of revenues for vital public services, forces higher burdens on tax payers, dislocates hundreds of thousands of legitimate jobs and exposes consumers to dangerous and ineffective products.

We commissioned the original Frontier report and this update because we believe that reliable information on the scope, scale, costs and impacts of counterfeiting and piracy is critical for helping policymakers to better understand that the trade in fakes is damaging their economies, threatening the health and safety of their citizens and stifling innovation and creativity.

BASCAP and INTA hope that better information on how counterfeiting and piracy undermine IP, innovation, economic growth and employment, will better enable policymakers to make the fight against IP theft a higher public policy priority – and take the actions needed to prevent the damage inflicted by counterfeiting and piracy.

BASCAP and INTA will continue to explore ways to add further research on this critical issue, and to work together and with other stakeholders to build greater awareness of the enormous costs of counterfeiting and piracy.

# EXECUTIVE SUMMARY

Counterfeiting and piracy are highly pervasive across countries and sectors, representing a multi-Billion-dollar industry globally that continues to grow. Measuring the scale of counterfeiting and piracy helps us to understand the size of the problem, and the related social costs. It also helps inform policymakers so that they can target resources appropriately towards combating counterfeiting and piracy.

## 1.1 Extending the findings of the OECD/EUIPO

Our starting point is the recent work undertaken by the Organization for Economic Cooperation and Development (OECD) and European Union Intellectual Property Office (EUIPO) to measure the extent of piracy and counterfeiting in international trade.[1] The OECD/EUIPO Report builds on a previous, ground-breaking study by the OECD in 2008. Since the publication of the initial report, researchers at the OECD have been able to bring significant enhancements to their research methodology, including improved econometric modelling, greater magnitudes of data and increased primary data from customs experts.

The OECD/EUIPO estimates that trade in counterfeit and pirated products accounted for as much as 2.5% of the value of international trade, or $461 Billion, in 2013.[2] Notably, this figure represents an increase of more than 80% over the OECD's findings in 2008.

Our report seeks to quantify the global value of counterfeiting and piracy and related economic and social costs. As revealing as the OECD/EUIPO Report is, its focus is on one specific aspect of counterfeiting and piracy: the international trade of counterfeits across borders.

We therefore draw on and extend the OECD/EUIPO Report to include additional types and impacts of counterfeiting and piracy delineated, but not quantified, in their analysis. Specifically, this study quantifies three additional categories of losses: (i) the value of domestically produced and consumed counterfeit goods, (ii) the value of digital piracy, and (iii) wider economic impacts. Our approach and analysis is a follow-on study from our 2011 report for BASCAP, which built on the OECD's 2008 analysis.

Our analysis consists of the following four dimensions.

- **Quadrant 1: Internationally traded counterfeit and pirated goods.** We reprise the OECD/EUIPO's recent estimates of the value of counterfeit and pirated physical goods in international trade. This captures the value of counterfeit goods that cross international borders. We also develop projections of this value to 2022.

- **Quadrant 2: Domestically produced and consumed counterfeit and pirated goods.** We estimate the value of domestically produced and consumed counterfeit and pirated goods using the findings of the OECD/EUIPO Report as a starting point. This

---

[1]    OECD/EUIPO (2016), Trade in Counterfeit and Pirated Goods: Mapping the Economic Impact, OECD Publishing, Paris. Available at: http://dx.doi.org/10.1787/9789264252653-en. (hereinafter "OECD/EUIPO Report")

[2]    Ibid.

captures the value of counterfeits that are produced and consumed within the borders of a country.

- **Quadrant 3: Piracy distributed through the Internet, mainly by peer-to-peer (P2P) sharing and streaming.** We estimate the value of digital piracy in film, music, and software, which is not captured in the OECD/EUIPO Report as it is based on physically traded goods. Our analysis draws on industry data and studies.

- **Quadrant 4: Wider economic and social impacts.** Building on the magnitudes calculated in quadrants 1-3, we measure related economic and social impacts of counterfeiting and piracy. Specifically, we:

  - Develop an econometric estimate of the impact of counterfeiting and piracy on foregone economic growth.

  - Present effects of the displacement by counterfeiting and pirating activities of legitimate activities on employment, FDI, and sales tax revenues.

  - Estimate costs of criminality related to counterfeiting and pirating activities

## 1.2 Key findings

Our analysis shows that the scale of counterfeiting and piracy globally is large, that it has grown since previous estimates, and that this growth is expected to continue. Our estimates of these values across all four quadrants are shown in Table 1.S below.

We estimate that the value of international and domestic trade in counterfeit and pirated goods in 2013 was $710 -$ 917 Billion. We estimate that, in addition to this, the global value of digital piracy in movies, music and software in 2015[3] was $213 Billion.

We estimated wider economic costs associated with the effects of counterfeiting and piracy on the displacement of legitimate economic activity. This estimate also provides a starting point for inferring fiscal losses. We also estimated the effects of counterfeiting and piracy on Foreign Direct Investment (FDI) and crime. The results are reported in Table 1 below.

---

[3] Digital piracy is calculated from 2015 data, which is the most recently available data

**Table 1.Summary of estimates of counterfeiting and piracy**

| Quadrant | Estimate | 2013 | 2022 (forecast) |
|---|---|---|---|
| **1** | Total international trade in counterfeit and pirated goods | $461 Billion | $991 Billion |
| **2** | Total domestic production and consumption of counterfeit pirated goods | $249 - $456Billion | $524 - $959 Billion |
| **3** | Digital piracy in movies, music and software | $213Billion | $384 - $856 Billion |
| | - Digital piracy in film | $160 Billion | $289-644 Billion |
| | - Digital piracy in music | $29 Billion | $53-117 Billion |
| | - Digital piracy in software | $24 Billion | $42-95 Billion |
| | **Total value of counterfeit and pirated goods** | **$923 Billion – 1.13 Trillion** | **$1.90 -$2.81 Trillion** |
| **4** | Wider economic and social costs | | |
| | - Displacement of legitimate economic activity | $470-$597 Billion | $980-$1244 Billion |
| | - Estimated reduction in FDI | $111 Billion | $231 Billion |
| | - Estimated fiscal losses | $96-$130 Billion | $199-$270 Billion |
| | - Estimated costs of crime | $60 Billion | $125 Billion |
| **4** | **Total Wider economic and social costs** | **$737-$898 Billion** | **$1.54 - $1.87 Trillion** |
| | **Estimated employment losses** | **2-2.6 million** | **4.2-5.4 million** |
| | **Foregone economic growth in OECD 2017** | **$30 Billion to $54 Billion** | |

*Source:* *Frontier estimates based on OECD 2013 data on counterfeiting in international trade, and UN trade and GDP data to derive estimates for domestic production and consumption. Data for Piracy based on latest industry sources (2015).*

We find significant effects on the job market through the displacement of legitimate economic activity by counterfeiting and piracy. We estimate net job losses in 2013 to lie, globally, between 2 and 2.6 million, and we project net job losses of 4.2 to 5.4 million by 2022.

We also estimated the effects of changes in the incidence of counterfeiting and piracy on economic growth. Our econometric model, estimating the impact of changes in the intensity of counterfeiting and piracy on economic growth, suggests that a percentage point reduction in the intensity of counterfeiting and piracy would be worth between $30 Billion to $54 Billion in 2017 for the 35 OECD countries.

Table 1 also reports forward projections out to the year 2022.

Our forward projections begin with OECD/EUIPO's estimates of international trade in counterfeit and pirated goods, augmented by forecasts of growth in import volumes and the ratio of customs seizures to real imports. Using these, we forecast that the value of trade in counterfeit and pirated goods could reach **$991 Billion** by 2022.

We carry out a similar exercise to illustrate how the size of domestic production and consumption of counterfeit and pirated goods may change over time. We use data on recent and forecast rates of growth in global trade and GDP, and projected growth in the rate of counterfeiting. Using this approach, we forecast that the value of domestically produced and consumed counterfeit and pirated goods could range from **$524 - $959 Billion** by 2022.

Applying the methodology used in our previous study, we combine two different approaches to project digital piracy into the future. The first approach assumes that digital piracy will maintain its share of total counterfeiting and piracy over time. The second approach assumes that digital piracy grows proportionally to global IP traffic. Combining these two approaches, we forecast that the value of digital piracy in movies, music and software could reach from **$384 - $856 Billion** by 2022.

## 1.3 Analytical approach

As recognised in the OECD/EUIPO Report, the estimation task is necessarily complicated by the fraudulent nature of counterfeiting, which relies on the activity being hidden from view. The OECD/EUIPO Report addresses this challenge via an innovative analytical approach that uses data on customs seizures. Individual sectors have also relied on surveys to understand the scale of counterfeiting and piracy that they face, as well as collecting data on the prevalence of counterfeiting and piracy as part of their routine IP enforcement activities.

To estimate the scale and impacts of counterfeiting and piracy, we use and build on the OECD/EUIPO Report, bringing in additional publicly available data from reputable sources such as the UN Statistics Division. We have drawn on industry data to develop our estimates of digital piracy. Throughout our analysis, we have engaged closely with relevant sector bodies to ensure that our approach is robust and the data sources are reliable.

To account for the significant uncertainty around the value of counterfeiting and piracy, we use conservative assumptions in our estimates, and provide ranges for our estimates. The main report sets out the data sources and assumptions used in detail, and the impact of the assumptions made on the interpretation of our analysis.

## 1.4 Agenda for future research

It is important to continue to highlight the scale of the challenge posed by counterfeiting and piracy globally. We believe that a number of next steps are important, including the following.

- ▪ Further research into the prevalence of counterfeiting and piracy of physically traded goods that don't cross borders. Our analysis infers the prevalence of

domestically produced and consumed counterfeits using the OECD/EUIPO analysis of internationally traded counterfeits. Further research would help ensure more precise estimates of the scale of domestic counterfeiting in future.

▪ The digital piracy landscape is changing rapidly. Further data collection and analysis to understand the scale of growing forms of digital piracy (e.g. gaming, copyright infringing user generated content, TV series) would help policymakers to better address policies to the problem of digital piracy.

▪ Further analysis of and improvements to the customs seizures data that underlies the OECD/EUIPO analysis would be beneficial, for example in helping policymakers build up a picture of how prevalence of counterfeiting in different sectors and geographies varies year on year.

## 5.5 Conclusion

There are substantial wider economic and social costs stemming from counterfeiting and piracy. Indeed, our estimates for displacement effects, employment effects, supressed FDI and crime probably understate the extent of these costs. This is because these estimates do not capture the effects of digital piracy.

Our econometric analysis of the link between piracy and GDP establishes a link between illicit activity and dampened growth, consistent with other empirical studies in this area. Erosion of intellectual property rights is associated with poorer standards of governance and transparency, reducing incentives to invest or innovate, impacting on the long-term growth path of a country. The displacement of genuine activity by illicit activity is also likely to reduce efficiency, as the 'underground' economy is likely to have more irregular supply chains that do not optimally allocate resources. The diversion from genuine to criminal activity reduces government tax revenues and may also have serious consumer impacts due to regulatory non-compliance.

We have modelled a number of these wider social costs in detail using data at the country and product level. The summary estimates of the wider social costs of counterfeiting are shown below. The 2022 forecast is developed by applying projected growth in counterfeiting to the 2013 figures.

**Table 12 Summary of estimates of wider impacts of international and domestic counterfeiting**

| Result | 2013 | 2022 (forecast) |
| --- | --- | --- |
| Estimated Displacement of economic activity | $470-$597 Billion | $980-$1244 Billion |
| Estimated FDI impact | $111 Billion | $231 Billion |
| Estimated tax loss | $96-$130 Billion | $199-$270 Billion |
| Estimated costs of crime due to counterfeiting | $60 Billion | $125 Billion |
| Estimated employment loss (gross) | 18-23 million | 38-49 million |
| Estimated employment loss (net) | 2-2.6 million | 4.2-5.4 million |
| Estimated value of lost growth (OECD region 2017) | $30-54 Billion | |

*Source: Frontier estimates*

# 6 CONCLUSIONS

In this section, we project the value of counterfeiting and piracy forward, and summarise our results across the four quadrants.

## 6.1 Projections of the future incidence of counterfeiting and piracy

We project the estimates forward to 2022 to show how the scale of counterfeiting and piracy may change over time.

First, we project forward the OECD/EUIPO's estimates of international trade in counterfeit and pirated goods to 2022. We forecast an average annual growth rate in trade of counterfeit and pirated goods of 9%.

## $991bn

We forecast that the value of international trade in counterfeit goods could reach $991 Billion by 2022.

This projection is estimated using a proxy for growth in future trade volumes. We draw on the World Trade Organisation's estimates of the annual growth rate of global merchandise import volumes, including forecasts to 2017. To forecast beyond 2017, we use the average actual and forecast growth rate as appropriate for 2012-17.

In addition, to account for the growth in counterfeiting and piracy, we use the average annual growth rate in the ratio of customs seizures to real imports in the EU and USA. These grew by 12% on average over 2005-14. Given that some of the growth in the ratio may result from stricter policy and enforcement (leading to an increase in seizures that in the past may entered unchecked), we assume that only half of this growth is the result of increased counterfeiting and piracy.

Using our estimate of the future growth rate of trade in counterfeit and pirated goods, we forecast that the value of trade in counterfeit and pirated goods could reach **$991 Billion** by 2022.

We carry out a similar exercise to illustrate how the size of domestic production and consumption of counterfeit and pirated goods may change over time, projecting our 2013 estimates forward. We forecast an average annual growth rate in domestic production and consumption of counterfeits of 9%.

## $524-959bn

We forecast that the value of domestically produced and consumed counterfeit goods could range from $524 - $959 Billion by 2022.

This is estimated by extrapolating from

recent and forecast global GDP growth, as reported by the World Trade Organisation, to estimate annual GDP growth of 2.6% on average. Additionally, we account for growth in counterfeiting and piracy in the same way as in our projections of future trade in counterfeit and pirated goods.

Using this approach, we forecast that the value of domestically produced and consumed counterfeit and pirated goods could range from **$524 - $959 Billion** by 2022. This is a conservative approach to forecasting growth in counterfeiting and piracy. Comparing our preferred estimates of domestic counterfeiting and piracy from 2011-13 suggests an observed annual growth rate of 14%, although some of this change over time could be the result of changes to enforcement policy, or measurement error.

Following our methodology in the previous study, we use two different approaches to project digital piracy into the future.

# $384-856bn

We forecast that the value of digital piracy in movies, music and software could range from $384 - $856 Billion by 2022.

- **The first approach assumes that all forms of digital piracy will maintain their respective share of total counterfeiting and piracy over time.** Our findings for 2015 suggest that the ratio of digital piracy to the value of counterfeit and pirated goods calculated in quadrants 1 and 2 lies between 0.20 and 0.25. If this ratio stays the same until 2022, the value of digital piracy will be approximately $384 Billion in 2022, according to our projections for quadrants 1 and 2. Proceeding in the same way on a disaggregated level, digital piracy in film will reach approximately $289 Billion, digital piracy in music $53 Billion and digital piracy in software $42 Billion in 2022. This approach is rather conservative because it does not take into account that internet usage in general and digital media consumption in particular are likely to grow faster over the next couple of years than the non-digital components of the market – as they have done in the past. Giving an example for media, the digital share of total media spending increased from 25.1% in 2008 to 40.1% in 2013 and is projected to rise to 50.4% in 2018[105]. It is likely that this could carry through to the share of digital piracy in total counterfeiting and piracy.

- **The second approach assumes that digital piracy grows proportionally to global IP traffic.** In a comprehensive study[106] Cisco projects global IP traffic to grow at a compound annual growth rate of 22% between 2015 and 2020. If piracy grows at the same speed as IP traffic and if the growth rate stays the same until 2022, all else being equal, the value of digital piracy is expected to reach $856 Billion in 2022 – comprising $644 from digital piracy in film, $117 from digital piracy in music and $95 from digital piracy in software. This approach is supported by one of the headline

---

[105] McKinsey Global Media Report 2014
[106] Cisco Visual Networking Index: Forecast and Methodology, 2015-2020

results of the NetNames study cited above: 'Internet usage continues to grow at a rapid pace; and with it, so does internet-based infringement.'[107]

Combining these two approaches, we forecast that the value of digital piracy in movies, music and software could reach from $384 - $856 Billion by 2022.

## 6.2   Projection of wider social and economic costs

As reported in section 5.5, we project changes in wider economic and social costs by applying projected growth in counterfeiting figures to the existing (2013) estimates, and assuming that the costs grow in line with counterfeiting. Based on that approach, we find that:

- Estimated impacts on lost Foreign Direct Investments are $231 Billion

- Estimated tax losses are $199 to $270 Billion

- Estimated costs of crime are $125 Billion

## 6.3   Summary of results

The analysis presented in this report underscores the magnitude of the policy problem posed by counterfeiting and piracy. Counterfeiting and piracy activities are broad in scope and large in value, and are growing.  Using the more robust methodology developed by the OECD, and applying this to more recent data, we find that in 2013, the economic value of counterfeit and pirated products is estimated at between $0.9 Trillion and $1.1 Trillion. Our projections for 2022 show an increase to between $1.9 Trillion to 2.81 Trillion.

Comparing the findings

Comparisons between this report and the one we published in 2011 need to be handled with care because of refinements made to the OECD's methodology.

Nonetheless, it is worthy of a review. In our previous report we projected that the value of counterfeiting and piracy activities would be between $1.2 and 1.8 Trillion in 2015. On the basis of the data and approach followed in this report, we adjusted our base data figures from 2013 to create a 2015-year comparison, and we estimate that in 2015, counterfeiting and piracy stood at between $1.1 Trillion and $1.6 Trillion.

---

[107] NetNames (2013) „Sizing the piracy universe"

This report also takes a wider, global approach and a much deeper investigation into the broader social economic impacts and finds the losses flowing from these activities are significant. In generating our estimates, we consider four aspects of the economy that are negatively impacted by counterfeiting and piracy: (i) the magnitude of displaced economic activity, (ii) the impact on foreign direct investment, (iv) fiscal costs, and (iv) the economic costs of crime. We arrive at a figure of $737 Billion to $898 Billion for 2013, and projections of between $1.6 Trillion and $1.9 Trillion in 2022. These are non-insignificant costs to the global economy, nearly equal to the economic value of counterfeit and pirated products.

This report also implements recognised methodologies to estimate the foregone growth and development opportunities that arise from counterfeiting and piracy. We estimate that on a global basis, an increase in the incidence of counterfeiting and piracy reduces growth rates by between 0.21 and 0.33 percentage points. For the OECD region, this is worth between $30 and 54 Billion in 2015 alone in foregone growth opportunities.

We also estimate significant employment effects: an estimated 2 to 2.6 million jobs lost globally in 2013, and projected losses of 4.2 to 5.4 million by 2022.

**Table 13      Summary of estimates of counterfeiting and piracy**

| Quadrant | Estimate | 2013 | 2022 (forecast) |
|---|---|---|---|
| 1 | Total international trade in counterfeit goods | $461 Billion | $991 Billion |
| 2 | Total domestic production and consumption of counterfeit goods | $249 - $456Billion | $524 - $959 Billion |
| 3 | Digital piracy in film, music and software | $213Billion | $384-856Billion |
| | -    Digital piracy in film | $160 Billion | $289-644 Billion |
| | -    Digital piracy in music | $29 Billion | $53-117 Billion |
| | -    Digital piracy in software | $24 Billion | $42-95 Billion |
| | **Total value of counterfeit and pirated goods** | **$923 Billion – 1.13 Trillion** | **$1.90 -$2.81 Trillion** |
| 4 | Wider economic and social costs | | |
| | -    Displacement of legitimate economic activity | $470-$597 Billion | $980-$1244 Billion |
| | -    Estimated reduction in FDI | $111 Billion | $231 Billion |
| | -    Estimated fiscal losses | $96-$130 Billion | $199-$270 Billion |
| | -    Estimated costs of crime | $60 Billion | $125 Billion |
| | **Total Wider economic and social costs** | **$737 Billion-898 Billion** | **$1.54 - $1.87 Trillion** |
| | **Estimated employment losses** | **2-2.6 million** | **4.2-5.4 million** |
| | **Foregone economic growth in OECD 2017** | **$30 Billion to $54 Billion** | |

*Source:*    *Frontier estimates based on OECD 2013 data on counterfeiting in international trade, and UN trade and GDP data to derive estimates for domestic production and consumption. Data for Piracy based on latest industry sources (2015).*

It is important to continue to highlight the scale of the challenge posed by counterfeiting and piracy globally. We believe that a number of next steps are important, including the following.

- Further research into the prevalence of counterfeiting and piracy of physically traded goods that don't cross borders. Our analysis infers the prevalence of domestically produced and consumed counterfeits using the OECD/EUIPO analysis of internationally traded counterfeits. Further research would help ensure more precise estimates of the scale of domestic counterfeiting in future.

- The digital piracy landscape is changing rapidly. Further data collection and analysis to understand the scale of growing forms of digital piracy (e.g. gaming, copyright infringing user generated content, TV series) would help policymakers to better target digital piracy.

  Further analysis of and improvements to the customs seizures data that underlies the OECD/EUIPO analysis would be beneficial, for example in helping policymakers build up a picture of how prevalence of counterfeiting in different sectors and geographies varies year on year.

As noted at the beginning of this report, measuring the scale of counterfeiting and piracy not only helps us to understand the size of the problem, and the related social costs, but more importantly, it helps inform policymakers. With greater awareness of and appreciation for the enormous size of the problem and the significant impacts of counterfeiting and piracy on consumers, society, government and business, policymakers are better equipped to assign greater priority to fighting these crimes and allocating resources appropriately towards combating counterfeiting and piracy.

# EXHIBIT 4

# Text of Hague Service Convention and Signatories

1. **Information and purchasing instructions for the Practical Handbook on the Operation of the Hague Service Convention.**
   http://www.hcch.net/index_en.php?act=publications.details&pid=2728
2. **Table of countries that participate, with links to the information for each country's Central Authority and other practical information about service in that country.**
   http://www.hcch.net/index_en.php?act=conventions.statusprint&cid=17
3. **Table listing the applicability of certain Convention articles in each country.**
   http://www.hcch.net/upload/applicability14e.pdf
4. **PDF model form for request of service abroad.**
   Fillable: http://www.hcch.net/upload/act_form14e.pdf
   Printable: http://www.hcch.net/upload/form14e2.pdf
5. **Instructions for filling out the model form.**
   http://www.hcch.net/index_en.php?act=publications.details&pid=27&dtid=2
6. **More general info. (i.e. not limited to Hague Service Convention) from the U.S. State Department on service abroad.**
   http://www.travel.state.gov/law/judicial/judicial_680.html

(information above provided by Offices of the AOC)

**14. CONVENTION ON THE SERVICE ABROAD OF JUDICIAL AND EXTRAJUDICIAL DOCUMENTS IN CIVIL OR COMMERCIAL MATTERS**

*(Concluded 15 November 1965)*

The States signatory to the present Convention,

Desiring to create appropriate means to ensure that judicial and extrajudicial documents to be served abroad shall be brought to the notice of the addressee in sufficient time,

Desiring to improve the organisation of mutual judicial assistance for that purpose by simplifying and expediting the procedure,

Have resolved to conclude a Convention to this effect and have agreed upon the following provisions:

Article 1

The present Convention shall apply in all cases, in civil or commercial matters, where there is occasion to transmit a judicial or extrajudicial document for service abroad.

This Convention shall not apply where the address of the person to be served with the document is not known.

CHAPTER I – JUDICIAL DOCUMENTS

Article 2

Each Contracting State shall designate a Central Authority which will undertake to receive requests for service coming from other Contracting States and to proceed in conformity with the provisions of Articles 3 to 6.

Each State shall organise the Central Authority in conformity with its own law.

Article 3

The authority or judicial officer competent under the law of the State in which the documents originate shall forward to the Central Authority of the State addressed a request conforming to the model annexed to the present Convention, without any requirement of legalisation or other equivalent formality.

The document to be served or a copy thereof shall be annexed to the request. The request and the document shall both be furnished in duplicate.

Article 4

If the Central Authority considers that the request does not comply with the provisions of the present Convention it shall promptly inform the applicant and specify its objections to the request.

Article 5

The Central Authority of the State addressed shall itself serve the document or shall arrange to have it served by an appropriate agency, either –

*a)* by a method prescribed by its internal law for the service of documents in domestic actions upon persons who are within its territory, or

*b)* by a particular method requested by the applicant, unless such a method is incompatible with the law of the State addressed.

Subject to sub-paragraph *(b)* of the first paragraph of this Article, the document may always be served by delivery to an addressee who accepts it voluntarily.

If the document is to be served under the first paragraph above, the Central Authority may require the document to be written in, or translated into, the official language or one of the official languages of the State addressed.

That part of the request, in the form attached to the present Convention, which contains a summary of the document to be served, shall be served with the document.

Article 6

The Central Authority of the State addressed or any authority which it may have designated for that purpose, shall complete a certificate in the form of the model annexed to the present Convention.

The certificate shall state that the document has been served and shall include the method, the place and the date of service and the person to whom the document was delivered. If the document has not been served, the certificate shall set out the reasons which have prevented service.

The applicant may require that a certificate not completed by a Central Authority or by a judicial authority shall be countersigned by one of these authorities.

The certificate shall be forwarded directly to the applicant.

2

## Article 7

The standard terms in the model annexed to the present Convention shall in all cases be written either in French or in English. They may also be written in the official language, or in one of the official languages, of the State in which the documents originate.

The corresponding blanks shall be completed either in the language of the State addressed or in French or in English.

## Article 8

Each Contracting State shall be free to effect service of judicial documents upon persons abroad, without application of any compulsion, directly through its diplomatic or consular agents.

Any State may declare that it is opposed to such service within its territory, unless the document is to be served upon a national of the State in which the documents originate.

## Article 9

Each Contracting State shall be free, in addition, to use consular channels to forward documents, for the purpose of service, to those authorities of another Contracting State which are designated by the latter for this purpose.

Each Contracting State may, if exceptional circumstances so require, use diplomatic channels for the same purpose.

## Article 10

Provided the State of destination does not object, the present Convention shall not interfere with –

a) the freedom to send judicial documents, by postal channels, directly to persons abroad,

b) the freedom of judicial officers, officials or other competent persons of the State of origin to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination,

c) the freedom of any person interested in a judicial proceeding to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination.

## Article 11

The present Convention shall not prevent two or more Contracting States from agreeing to permit, for the purpose of service of judicial documents, channels of transmission other than those provided for in the preceding Articles and, in particular, direct communication between their respective authorities.

## Article 12

The service of judicial documents coming from a Contracting State shall not give rise to any payment or reimbursement of taxes or costs for the services rendered by the State addressed.

The applicant shall pay or reimburse the costs occasioned by –-

a) the employment of a judicial officer or of a person competent under the law of the State of destination,

b) the use of a particular method of service.

## Article 13

Where a request for service complies with the terms of the present Convention, the State addressed may refuse to comply therewith only if it deems that compliance would infringe its sovereignty or security.

It may not refuse to comply solely on the ground that, under its internal law, it claims exclusive jurisdiction over the subject-matter of the action or that its internal law would not permit the action upon which the application is based.

The Central Authority shall, in case of refusal, promptly inform the applicant and state the reasons for the refusal.

## Article 14

Difficulties which may arise in connection with the transmission of judicial documents for service shall be settled through diplomatic channels.

## Article 15

Where a writ of summons or an equivalent document had to be transmitted abroad for the purpose of service, under the provisions of the present Convention, and the defendant has not appeared, judgment shall not be given until it is established that –

3

*a)* the document was served by a method prescribed by the internal law of the State addressed for the service of documents in domestic actions upon persons who are within its territory, or

*b)* the document was actually delivered to the defendant or to his residence by another method provided for by this Convention,

and that in either of these cases the service or the delivery was effected in sufficient time to enable the defendant to defend.

Each Contracting State shall be free to declare that the judge, notwithstanding the provisions of the first paragraph of this Article, may give judgment even if no certificate of service or delivery has been received, if all the following conditions are fulfilled –

*a)* the document was transmitted by one of the methods provided for in this Convention,

*b)* a period of time of not less than six months, considered adequate by the judge in the particular case, has elapsed since the date of the transmission of the document,

*c)* no certificate of any kind has been received, even though every reasonable effort has been made to obtain it through the competent authorities of the State addressed.

Notwithstanding the provisions of the preceding paragraphs the judge may order, in case of urgency, any provisional or protective measures.

Article 16

When a writ of summons or an equivalent document had to be transmitted abroad for the purpose of service, under the provisions of the present Convention, and a judgment has been entered against a defendant who has not appeared, the judge shall have the power to relieve the defendant from the effects of the expiration of the time for appeal from the judgment if the following conditions are fulfilled –

*a)* the defendant, without any fault on his part, did not have knowledge of the document in sufficient time to defend, or knowledge of the judgment in sufficient time to appeal, and

*b)* the defendant has disclosed a *prima facie* defence to the action on the merits.

An application for relief may be filed only within a reasonable time after the defendant has knowledge of the judgment.

Each Contracting State may declare that the application will not be entertained if it is filed after the expiration of a time to be stated in the declaration, but which shall in no case be less than one year following the date of the judgment.

This Article shall not apply to judgments concerning status or capacity of persons.

CHAPTER II – EXTRAJUDICIAL DOCUMENTS

Article 17

Extrajudicial documents emanating from authorities and judicial officers of a Contracting State may be transmitted for the purpose of service in another Contracting State by the methods and under the provisions of the present Convention.

CHAPTER III – GENERAL CLAUSES

Article 18

Each Contracting State may designate other authorities in addition to the Central Authority and shall determine the extent of their competence.

The applicant shall, however, in all cases, have the right to address a request directly to the Central Authority.

Federal States shall be free to designate more than one Central Authority.

Article 19

To the extent that the internal law of a Contracting State permits methods of transmission, other than those provided for in the preceding Articles, of documents coming from abroad, for service within its territory, the present Convention shall not affect such provisions.

Article 20

The present Convention shall not prevent an agreement between any two or more Contracting States to dispense with –

*a)* the necessity for duplicate copies of transmitted documents as required by the second paragraph of Article 3,

*b)* the language requirements of the third paragraph of Article 5 and Article 7,

*c)* the provisions of the fourth paragraph of Article 5,

*d)* the provisions of the second paragraph of Article 12.

Article 21

4

Each contracting State shall, at the time of the deposit of its instrument of ratification or accession, or at a later date, inform the Ministry of Foreign Affairs of the Netherlands of the following –
*a)* the designation of authorities, pursuant to Articles 2 and 18,
*b)* the designation of the authority competent to complete the certificate pursuant to Article 6,
*c)* the designation of the authority competent to receive documents transmitted by consular channels, pursuant to Article 9.
Each Contracting State shall similarly inform the Ministry, where appropriate, of –
*a)* opposition to the use of methods of transmission pursuant to Articles 8 and 10,
*b)* declarations pursuant to the second paragraph of Article 15 and the third paragraph of Article 16,
*c)* all modifications of the above designations, oppositions and declarations.

### Article 22

Where Parties to the present Convention are also Parties to one or both of the Conventions on civil procedure signed at The Hague on 17th July 1905, and on 1st March 1954, this Convention shall replace as between them Articles 1 to 7 of the earlier Conventions.

### Article 23

The present Convention shall not affect the application of Article 23 of the Convention on civil procedure signed at The Hague on 17th July 1905, or of Article 24 of the Convention on civil procedure signed at The Hague on 1st March 1954.
These Articles shall, however, apply only if methods of communication, identical to those provided for in these Conventions, are used.

### Article 24

Supplementary agreements between Parties to the Conventions of 1905 and 1954 shall be considered as equally applicable to the present Convention, unless the Parties have otherwise agreed.

### Article 25

Without prejudice to the provisions of Articles 22 and 24, the present Convention shall not derogate from Conventions containing provisions on the matters governed by this Convention to which the Contracting States are, or shall become, Parties.

### Article 26

The present Convention shall be open for signature by the States represented at the Tenth Session of the Hague Conference on Private International Law.
It shall be ratified, and the instruments of ratification shall be deposited with the Ministry of Foreign Affairs of the Netherlands.

### Article 27

The present Convention shall enter into force on the sixtieth day after the deposit of the third instrument of ratification referred to in the second paragraph of Article 26.
The Convention shall enter into force for each signatory State which ratifies subsequently on the sixtieth day after the deposit of its instrument of ratification.

### Article 28

Any State not represented at the Tenth Session of the Hague Conference on Private International Law may accede to the present Convention after it has entered into force in accordance with the first paragraph of Article 27. The instrument of accession shall be deposited with the Ministry of Foreign Affairs of the Netherlands.
The Convention shall enter into force for such a State in the absence of any objection from a State, which has ratified the Convention before such deposit, notified to the Ministry of Foreign Affairs of the Netherlands within a period of six months after the date on which the said Ministry has notified it of such accession.
In the absence of any such objection, the Convention shall enter into force for the acceding State on the first day of the month following the expiration of the last of the periods referred to in the preceding paragraph.

### Article 29

Any State may, at the time of signature, ratification or accession, declare that the present Convention shall extend to all the territories for the international relations of which it is

responsible, or to one or more of them. Such a declaration shall take effect on the date of entry into force of the Convention for the State concerned.

At any time thereafter, such extensions shall be notified to the Ministry of Foreign Affairs of the Netherlands.

The Convention shall enter into force for the territories mentioned in such an extension on the sixtieth day after the notification referred to in the preceding paragraph.

Article 30

The present Convention shall remain in force for five years from the date of its entry into force in accordance with the first paragraph of Article 27, even for States which have ratified it or acceded to it subsequently.

If there has been no denunciation, it shall be renewed tacitly every five years.

Any denunciation shall be notified to the Ministry of Foreign Affairs of the Netherlands at least six months before the end of the five year period.

It may be limited to certain of the territories to which the Convention applies.

The denunciation shall have effect only as regards the State which has notified it. The Convention shall remain in force for the other Contracting States.

Article 31

The Ministry of Foreign Affairs of the Netherlands shall give notice to the States referred to in Article 26, and to the States which have acceded in accordance with Article 28, of the following –

a) the signatures and ratifications referred to in Article 26;

b) the date on which the present Convention enters into force in accordance with the first paragraph of Article 27;

c) the accessions referred to in Article 28 and the dates on which they take effect;

d) the extensions referred to in Article 29 and the dates on which they take effect;

e) the designations, oppositions and declarations referred to in Article 21;

f) the denunciations referred to in the third paragraph of Article 30.

In witness whereof the undersigned, being duly authorised thereto, have signed the present Convention.

Done at The Hague, on the 15th day of November, 1965, in the English and French languages, both texts being equally authentic, in a single copy which shall be deposited in the archives of the Government of the Netherlands, and of which a certified copy shall be sent, through the diplomatic channel, to each of the States represented at the Tenth Session of the Hague Conference on Private International Law.

# SIGNATORIES 14: Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters

Entry into force: 10-II-1969, Last update: 27-I-2011
Number of Contracting States to this Convention: 62

1) S = Signature
2) R/A/Su = Ratification, Accession or Succession
3) Type = R: Ratification;
A: Accession;
A*: Accession giving rise to an acceptance procedure; click on A* for details of acceptances of the accession;
C: Continuation;
Su: Succession;
Den: Denunciation;
4) EIF = Entry into force
5) Ext = Extensions of application
6) Auth = Designation of Authorities
7) Res/D/N = Reservations, declarations or notifications

**Members of the Organisation (click here for the non-Member States)**

| States | S[1] | R/A/Su [2] | Type [3] | EIF [4] | Ext [5] | Auth [6] | Res/D/N [7] |
|---|---|---|---|---|---|---|---|
| Albania | | 1-XI-2006 | A | 1-VII-2007 | | 3 | |
| Argentina | | 2-II-2001 | A | 1-XII-2001 | 2 | | D,Res5,10,15,16 |
| Australia | | 15-III-2010 | A | 1-XI-2010 | 7 | 5 | D5,8,9,10,15,16,17,29 |
| Belarus | | 6-VI-1997 | A | 1-II-1998 | | 1 | |
| Belgium | 21-I-1966 | 19-XI-1970 | R | 18-I-1971 | | 2 | D8,15,16 |
| Bosnia and Herzegovina | | 16-VI-2008 | A | 1-II-2009 | | 1 | |
| Bulgaria | | 23-XI-1999 | A | 1-VIII-2000 | | 3 | D5,8,10,15,16 |
| Canada | | 26-IX-1988 | A | 1-V-1989 | | 4 | D5,8,10,11,12,15,16,2 |
| China, People's Republic of | | 6-V-1991 | A | 1-I-1992 | | 8 | D,N5,8,10,15,16 |
| Croatia | | 28-II-2006 | A | 1-XI-2006 | | 3 | Res,D5,6,8,9,10,15,16 |
| Cyprus | | 26-X-1982 | A | 1-VI-1983 | | 4 | D8,10,15,16 |
| Czech Republic | | 28-I-1993 | Su | 1-I-1993 | | 4 | D,Res8,10,15,29 |
| Denmark | 7-I- | 2-VIII- | R | 1-X- | | 3 | D10,15,16 |

7

| | 1969 | 1969 | | 1969 | | | |
|---|---|---|---|---|---|---|---|
| Egypt | 1-III-1966 | 12-XII-1968 | R | 10-II-1969 | | 1 | Res8,10 |
| Estonia | | 2-II-1996 | A | 1-X-1996 | | 1 | D10,15,16 |
| Finland | 15-XI-1965 | 11-IX-1969 | R | 10-XI-1969 | | 2 | D2,9,10 |
| France | 12-I-1967 | 3-VII-1972 | R | 1-IX-1972 | 1 | 3 | D8,15,16 |
| Germany | 15-XI-1965 | 27-IV-1979 | R | 26-VI-1979 | | 3 | D5,8,10,15,16 |
| Greece | 20-VII-1983 | 20-VII-1983 | R | 18-IX-1983 | | 1 | D8,10,15 |
| Hungary | | 13-VII-2004 | A | 1-IV-2005 | | 3 | D2,5,6,8,9,10,15,16 |
| Iceland | | 10-XI-2008 | A | 1-VII-2009 | | 1 | D,Res10,15,16 |
| India | | 23-XI-2006 | A | 1-VIII-2007 | | 1 | D,Res10,15,16 |
| Ireland | 20-X-1989 | 5-IV-1994 | R | 4-VI-1994 | | 3 | D,Res10,15 |
| Israel | 25-XI-1965 | 14-VIII-1972 | R | 13-X-1972 | | 2 | D,Res10,16 |
| Italy | 25-I-1979 | 25-XI-1981 | R | 24-I-1982 | | 3 | D5,12 |
| Japan | 12-III-1970 | 28-V-1970 | R | 27-VII-1970 | | 3 | D10,15 |
| Korea, Republic of | | 13-I-2000 | A | 1-VIII-2000 | | 2 | D,Res8,10,15 |
| Latvia | | 28-III-1995 | A | 1-XI-1995 | | 4 | D5,8,10,15 |
| Lithuania | | 2-VIII-2000 | A | 1-VI-2001 | | 1 | D,Res8,10,15,16 |
| Luxembourg | 27-X-1971 | 9-VII-1975 | R | 7-IX-1975 | | 1 | D,Res5,8,15,16 |
| Mexico | | 2-XI-1999 | A | 1-VI-2000 | | 1 | D5,6,8,10,12,15,16 |
| Monaco | | 1-III-2007 | A | 1-XI-2007 | | 2 | D8,10,15,16 |
| Netherlands | 15-XI-1965 | 3-XI-1975 | R | 2-I-1976 | 1 | 5 | D15,16 |
| Norway | 15-X-1968 | 2-VIII-1969 | R | 1-X-1969 | | 3 | D,Res8,10,15,16 |
| Poland | | 13-II-1996 | A | 1-IX-1996 | | 4 | Res8,10 |
| Portugal | 5-VII-1971 | 27-XII-1973 | R | 25-II-1974 | | 2 | D8,15,16 |
| Romania | | 21-VIII-2003 | A | 1-IV-2004 | | 2 | D8,16 |
| Russian Federation | | 1-V-2001 | A | 1-XII-2001 | | 4 | D,Res2,3,5,6,8,9,10,12,15 |

| States | S | R/A/Su | Type | EIF | Ext | Auth | Res/D/N |
|---|---|---|---|---|---|---|---|
| Serbia | | 2-VII-2010 | A | 1-II-2011 | | 2 | D5,6,8,10,15,16 |
| Slovakia | | 15-III-1993 | Su | 1-I-1993 | | 4 | D8,10,15,29 |
| Slovenia | | 18-IX-2000 | A | 1-VI-2001 | | 1 | |
| Spain | 21-X-1976 | 4-VI-1987 | R | 3-VIII-1987 | | 3 | D15,16 |
| Sri Lanka | | 31-VIII-2000 | A | 1-VI-2001 | | 3 | D7,8,10,15 |
| Sweden | 4-II-1969 | 2-VIII-1969 | R | 1-X-1969 | | 2 | D5,10 |
| Switzerland | 21-V-1985 | 2-XI-1994 | R | 1-I-1995 | | 3 | D,Res1,5,8,10,15 |
| The former Yugoslav Republic of Macedonia | | 23-XII-2008 | A | 1-IX-2009 | | 1 | D,Res5,6,8,9,10,15,16,21 |
| Turkey | 11-VI-1968 | 28-II-1972 | R | 28-IV-1972 | | 3 | Res,D8,10,15,16 |
| Ukraine | | 1-II-2001 | A | 1-XII-2001 | | 3 | D,Res8,10,15,16 |
| United Kingdom of Great Britain and Northern Ireland | 10-XII-1965 | 17-XI-1967 | R | 10-II-1969 | 14 | 4 | D2,5,10,15,16,18 |
| United States of America | 15-XI-1965 | 24-VIII-1967 | R | 10-II-1969 | 1 | 1 | D2,15,16,29 |
| Venezuela | | 29-X-1993 | A | 1-VII-1994 | | 1 | D,Res5,8,10,1516 |

## Non-Member States of the Organisation ([click here for the Members](#))

| States | S[1] | R/A/Su[2] | Type[3] | EIF[4] | Ext[5] | Auth[6] | Res/D/N[7] |
|---|---|---|---|---|---|---|---|
| Antigua and Barbuda | | 1-V-1985 | Su | 1-XI-1981 | | 1 | |
| Bahamas | | 17-VI-1997 | A | 1-II-1998 | | 1 | |
| Barbados | | 10-II-1969 | A | 1-X-1969 | | 1 | |
| Belize | | 8-IX-2009 | A | 1-V-2010 | | | |
| Botswana | | 10-II-1969 | A | 1-IX-1969 | | 3 | D5,10,15 |
| Kuwait | | 8-V-2002 | A | 1-XII-2002 | | 3 | D,Res6,8,9,10,15,16,18 |
| Malawi | | 24-IV-1972 | A | 1-XII-1972 | | 1 | |
| Pakistan | | 7-XII-1988 | A | 1-VIII-1989 | | 3 | D8,15,16 |
| Saint Vincent and the Grenadines | | 6-I-2005 | Su | 27-X-1979 | | 3 | D5,10,15 |
| San Marino | | 15-IV-2002 | A | 1-XI-2002 | | 3 | D8,10,15 |
| Seychelles | | 18-XI-1980 | A | 1-VII-1981 | | 1 | D8,10,15,16 |